BAR HARBOR AND UNION RIVER POWER COMPANY

*vs.*

THE FOUNDATION COMPANY.

Penobscot.      Opinion April 4, 1930.

Sherman N. Shumway,
Daniel E. Hurley,
Ryder & Simpson,
Cook, Hutchinson, Pierce & Connell,
Clark, Clark, McCarthy & Wagner, for plaintiff.
W. B. & H. N. Skelton,
George F. Eaton,
Harry L. Crabtree,
Vermont Hatch, for defendant.

SITTING: DEASY, C. J., DUNN, STURGIS, BARNES, PATTANGALL, FARRINGTON, JJ.

DUNN, J. The trial judge reported this case, plaintiff and defendant consenting, for final decision by the full court. By the report, it is understood that the parties waive all matters of form and process, and desire this court to rule the law and decide the facts, on consideration of the legally admissible and relevant evidence. R. S., Chap. 82, Sec. 46; *Pillsbury* v. *Brown*, 82 Me., 450; *Dansky* v. *Kotimaki*, 125 Me., 72.

The suit is for the failure of a storage reservoir dam. The dam had been across the Union river, above Ellsworth. Primary inquiry is whether the facts give rise to action. If yes, there must be assessment of direct or general damages; remote or indirect damages, stipulation reserves for referees. On negative decision of the main problem, judgment will go for the defendant.

In 1922, an hydraulic engineer, on plaintiff's office staff, made plans and specifications, and selected a site, for the dam, expecting

to supervise its erection. But, on the engineer's accepting employment elsewhere, plaintiff chose to have the dam built by contract.

After examining and approving the plans, defendant bid. Its bid was accepted. Defendant brought to Bangor a draft of written agreement already signed in its behalf, which plaintiff's president executed. One Phifer Smith, an employee of the plaintiff corporation, "attested," or witnessed, execution of the document. Mr. Smith signed his name above the typewritten word, "Engineer."

Defendant's contractual obligation was to construct the dam, as agent of the plaintiff, on a designated site, conformably to the plans and specifications, for the fee or reward, net to it, of seventeen thousand dollars. Defendant agreed to render "engineering services"; supply the necessary plant; employ and discharge forces; organize and direct the work; submit estimates, and, on previous authorization, to buy materials. Opportunity should be afforded plaintiff's representatives, the contract expressly provided, to inspect both materials and work, and to verify accounts and charges.

Corresponding counter obligation bound plaintiff to pay defendant's fee, and to furnish and bear the cost of all materials, wages, transportation, salaries, and the like, apart from any within the inclusion of the fee. Besides, plaintiff promised, for extra or incidental work which it might require defendant to perform, the payment of an additional fee, proportionate to the labor charged.

Upon the "Engineer," the contract imposed high duties. Bog must be removed to his satisfaction; he should determine, preliminarily to founding the dam, that excavation had extended to and exposed ledge; he should see to the proportioning and mixing of cement. Additional decisions, too, were to be by him.

Other provisions of the contract are not of present moment.

The plans outlined a concrete spillway, ninety feet long, with three twenty-foot gates for discharging water. There were two log sluices at the east end of the spillway, each eight feet wide. Under one sluice was a drainage sluice. Concrete abutments supported the spillway section. A concrete core tied to each abutment extended, through a bank of earth to high ground. Downstream, for some forty-two feet, was an apron. The plan showed

the whole dam on ledge or bedrock, at slightly varying elevations.

On July 5, 1922, defendant began work.

In August, at lower than plan level, there was no ledge. The dam was founded on that kind of soil known as hardpan. Ninety-two per cent. of the dam had been built, when, on March 15, 1923, invoking contract power, plaintiff forbade completion of the work by defendant; the reason assigned being want of diligence in performance. After this, plaintiff did the work.

In April, while snow was yet on the ground, the impounding of water was begun. Late in the month heavy rain fell. At normal elevation, the pond had an area of eighteen square miles, and capacity for six billion cubic feet of water. The pond filled to overflowing. Efforts to avert danger by opening the gates in the dam, and attempting to regulate the flow of the ponded water, proved unavailing. On May 2, the dam blew out. The loosed waters, raging to the sea, did much damage.

Plaintiff contends that defendant, in disregard of its contract, and of the duty which the contract cast, erected a dam, not reasonably efficient, but structurally weak; wherefore the dam was lost.

Evidence points in such direction, but it does not point so far. Concrete may not have been properly mixed; laitance, that pulpy gelatinous fluid which exudes from cement, may not always have been sufficiently cleared away; there may have been, to use an engineering term, improper bondings. But vital defect is not shown to have been in the dam itself.

Plaintiff contends further that the failure to extend sheet steel piling alongside the dam, upstream, to the east abutment, and into the east core wall, permitted seepage or percolation beneath the structure, to its immediate loss. Also, that, a concrete floor, which, insistence is, the plan delineates in a sluice, not having been laid, this omission became, in natural and continuous sequence, the cause of the disaster.

Defendant denies responsibility for not driving the piling; denies call in the plan for a concrete floor in the sluice; and insists that, to the time of its dismissal from the job, it had substantially performed its contract under the direction and to the approval of the "Engineer."

The meaning of the contract phrase, "engineering services," is the subject of much argument.

Plaintiff argues that the contract meant such services in designing the dam and in constructing it as well. Objection is made that, within the reasonable scope of the contract, defendant's undertaking was to erect a dam, agreeably to the plans plaintiff had made, or such modifications thereof as, under the reserved power to require defendant to do incidental work, plaintiff might make; erection to be on the site plaintiff had selected.

It is fundamental, in construing written contracts, that valid intention, as deduced from the language of the whole instrument, interpreted with reference to the situation of the parties at the time the contract was made, must prevail. *Bell* v. *Jordan*, 102 Me., 67. Such intention, which has been called the polestar of construction, must be gathered from the writing, construed in respect to the subject-matter, the motive and purpose of making the agreement, and the object to be consummated. *Roberts* v. *McIntire*, 84 Me., 362.

Oral evidence is not admissible to contradict or vary that which a writing expresses. If, in the writing, there be ambiguity, oral evidence is admissible to discover what the contracting parties had in view. Oral evidence, in such a case, does not usurp the authority of the written instrument; it is the instrument which operates; the oral evidence does no more than assist its operation. *Farwell* v. *Tillson*, 76 Me., 227, 242. The distinction between varying a written contract by oral evidence, and resorting to such evidence in aid of its construction, when not kept in mind, often leads to error.

Every instrument in writing, although it can not be varied or controlled by extrinsic evidence, must be read in the light of the circumstances surrounding its execution to effectuate its main end. *Eustace* v. *Dickey*, 240 Mass., 55, 72.

An ambiguous contract will be construed most strongly against him who used the words concerning which doubt arises. 13 C. J., 544.

Canonical principles lead, through obscurity and doubtfulness, to true meaning. But no extrinsic evidence rule, however seeming its equity, may supersede the other rule that, when the language of

the instrument, in its literal sense, or as applied to the facts, shows the real nature of the agreement, that language governs. *Martin v. Smith*, 102 Me., 27. Intention, when apparent, must control. *Abbott v. Abbott*, 51 Me., 575, 581.

Plaintiff's own engineer had located the site for the dam, and had designed the dam. Plaintiff, then, had no occasion to contract for the services of an engineer to locate a site, or to design a dam. The dominant note of the contract is the erection of an already designed dam on a given site; plaintiff reserving power to require the performance of incidental work.

The "Engineer," in whom the actual contract vested authority, supervisory and other, was not he who had made the designs and specifications. That this engineer was leaving his employment, and leaving the vicinity, was, as has been seen, motivation for contracting. It would be unusual, but not without parallel, to leave it to a contractor to supervise performance of his own contract. This contract did not do that. It left supervision to the "Engineer." Smith, the attester of the contract, over the word, "Engineer," is found to have been first to act under the contract as "Engineer." From the marking out of the lines for the dam till he went from plaintiff's employment, he was frequently at the dam site laying out work, directing, noting progress. Interpretation indicated by acts of parties is justly entitled to weight. *Lewiston, etc., Company v. The Grand Trunk, etc., Company*, 97 Me., 261.

Defendant, in contracting, was justified in assuming that ledge had been located. When, where the plan showed ledge to be, ledge had not been struck, and there was no clue to the whereabouts of ledge, decisive consideration became necessary.

One day an engineer from away came to the site. Professional interest only may have attracted him there, in deviation from his journey to another water power; but without following out how he happened to be there, or whether Smith had authority to consult him in the exigency of the absence of ledge, that Smith did consult him tends to contradict Smith's testimony that he had not been engineer. So does testimony by the newspaper man that Smith announced himself as engineer; likewise, testimony that Smith, leaving the job, introduced his successor as engineer.

Mr. Smith consulted with defendant's representatives, who advised defendant's New York office that ledge had not been encountered.

Defendant, its opinion asked, advised. It advised, if earth were substituted for ledge foundation, redesigning the dam, and that there be adequate protection against seepage, and against scour.

Whether the advice was given gratuitously, or within the contract, no fraud is shown. There is no evidence of such gross mistake as would imply bad faith; no evidence of the exercise of other than honest judgment; no evidence that defendant did not use the average skill of its business. There is evidence that the advice was not followed.

Without change in design, the dam was rested on hardpan. Engineer Smith knew it was being so rested. His successor came with knowledge that it had been thus founded. Every engineer about the site, from the laying of the sill to the collapse of the dam, knew that the structure had been built on earth. One can not resist the conclusion, from the evidence, that the founding of the dam had been by direction of the plaintiff, or what, on the record, is the same thing, by the direction of the "Engineer," with the approval of the plaintiff.

It is said in behalf of defendant's denial of fault contributory to the loss of the dam that, not only was the dam built on hardpan, by plaintiff's direction, but that plaintiff, though its attention had been called thereto, never provided adequate protection against downstream scour.

Water flowing over a dam will eat away the earth it impacts; a current of water through a dam will erode the earth over which it flows; the scouring action of water will undermine a dam if it work back to a foundation which, though virtually impervious to water, is susceptible to scour.

Defendant's theory, respecting the failure of the dam, is that water discharged through the dam worked back, under the insufficient apron, and under certain piers, and scoured the foundation. The dam, resistance thereby lowered, fractured. The fracture let the water through, and the dam was pushed out. This theory maybe ingenious, maybe convincing, is not without support in evidence.

88

Plaintiff, however, has the burden of proof in this action, *ex delicto* as sued, and *ex delicto* as tried, for the alleged violation of contractual obligation or duty. *Milford* v. *Bangor, etc., Company*, 104 Me., 233.

Plaintiff places the immediate cause of the loss of the dam upon percolation or seepage originating above and passing underneath the structure, this possible, contention is, because the sheet steel piling, which the plan had not indicated, but the driving of which had been begun, had not been driven far enough eastward.

The proof falls short of sustaining such contention. A fair preponderance of the evidence does not establish the violation of any contractual duty owed plaintiff by defendant which proximately resulted in the failure of the dam.

*Judgment for defendant.*