**Robert L. CALLAHAN et al.**

v.

**GANNESTON PARK DEVELOPMENT CORP. et al.**

Supreme Judicial Court of Maine.

Aug. 29, 1968.

Lewis I. Naiman, Gardiner, for plaintiffs.

William M. Finn, Joseph B. Campbell, Augusta, for defendants.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY and WEATHERBEE, JJ.

WEBBER, Justice.

The principal defendant, Ganneston Park Development Corporation, was the owner of a large tract of land in Augusta. It caused a plan of the area showing a division into numbered lots and the location of proposed streets and ways to be prepared and recorded. It then sold certain lots by reference to this plan. It called its land development project Ganneston Park. Some time after recording its plan, Ganneston prepared and had recorded a "Declaration" purporting to "subject" Ganneston Park to certain "terms, conditions, covenants, restrictions, agreements, easements and charges * * * for the protection and benefit of Ganneston Park and each lot owner therein." Article XX of the "Declaration," the legal effect of which presents the principal issue here, provided: "Corporation reserves the right to alter in any way the dimensions, boundaries, or location of any recorded but unsold building lot, common area or way, without obtaining a release or releases from any building lot owner or party having any interest in any building lot, whenever, in the sole discretion of Corporation, it is either necessary or desirable in the development of Ganneston Park."

The plaintiffs, Dr. and Mrs. Callahan, purchased lot #11 by reference to the recorded plan. The plan shows this lot as bounded on its southwesterly side by Deer Run, a proposed street fifty feet wide, on its northwesterly side by "Cul De Sac," a proposed dead end street forty feet wide and terminating northerly of the Callahan lot in a circular turn around, on its northeasterly side by lot #16 and on its southeasterly side by lot #4. The deed from Ganneston to plaintiffs described the lot conveyed not only by number with reference to the plan but also by metes and bounds making both the "Southeast line of the street shown on said plan as 'Cul De Sac'" and the "northeast line of Deer Run" monuments and boundaries. This deed also incorporated the "Declaration" by reference in these terms: "This conveyance is made subject to the covenants and restrictions contained in a certain Declaration recorded in the Kennebec County Registry of Deeds, in Book 1352, Page 288, which Declaration is incorporated herein and made a part hereof."

Ganniston now proposes and intends to exercise its asserted rights under Article

XX by eliminating "Cul De Sac" and joining the area thereof to the area lying northwesterly thereof (now lots numbered 12 and 13 on the plan) to form three new building lots. Its alleged reason for this proposal is that savings will be effected thereby in installing sewer facilities. This proposed action was permanently enjoined below and appeal from that judgment brings the matter here.

■ Although the Justice below was not requested to and did not make specific findings of fact in connection with the final judgment (some findings, however, having been made when a temporary injunction was issued), we look to the evidence to see what factual conclusions find credible support therein. "Inasmuch as the presiding Justice made no specific findings of fact, it must be assumed that he found for the (plaintiffs) upon all issues of fact necessarily involved." Sanfacon v. Gagnon, (1933) 132 Me. 111, 113, 167 A. 695; Everett v. Rand, (1957) 152 Me. 405, 407, 131 A.2d 205. Under well established rules the judgment below will stand unless clearly erroneous.

The evidence (some of it admitted over objections for reasons hereinafter considered) would support findings that plaintiffs were shown lot #11 by an officer of Ganneston who sought to persuade them to purchase that lot; that this officer represented the lot as a "corner lot" at the intersection of Deer Run and Cul De Sac, the latter street being forty feet wide; that this officer described Cul De Sac as a "barrier zone," which inferentially would mean a "barrier" between lots #11 and #12; that Deer Run was not then finished but was "roughly open;" that Cul De Sac was pointed out on the face of the earth, it being then "in evidence" and "roughed in;" that this officer represented that Cul De Sac was "part of the future development" and "would remain;" that he further stated that lot #11 was "bound (sic) by a cul de sac;" that plaintiffs purchased lot #11, accepted a deed thereof without knowledge that the "Declaration" was incorporated by reference on the second page thereof, and subsequently erected a home thereon costing approximately $40,000. Plaintiffs testified that they first saw a copy of the "Declaration" after their purchase and while their home was being constructed; and that they saw a copy of the recorded plan before they purchased their lot.

The defendants vigorously contend that the deed and the "Declaration" incorporated therein by reference constituted an integrated written agreement which may not be varied by parol evidence. Thus, they assert, there exists no legally binding agreement that lot #11 will remain a corner lot or that Cul De Sac will remain a proposed street and a barrier between lots #11 and #12. They further contend that the rights reserved by Article XX effectively negative any intention to dedicate Cul De Sac as a proposed street and as a result Ganneston has as yet made no offer to dedicate any of the streets and ways shown on its plan.

We deal first with the parol evidence issue. "Oral evidence is not admissible to contradict or vary that which a writing expresses. If, in the writing, there be ambiguity, oral evidence is admissible to discover what the contracting parties had in view. Oral evidence, in such a case, does not usurp the authority of the written instrument; it is the instrument which operates; the oral evidence does no more than assist its operation. * * *. [t]he distinction between varying a written contract by oral evidence, and resorting to such evidence in aid of its construction, when not kept in mind, often leads to error. Every instrument in writing, although it cannot be varied or controlled by extrinsic evidence, must be read in the light of the circumstances surrounding its execution to effectuate its main end. * * *. An ambiguous contract will be construed most strongly against him who used the words concerning which doubt arises. * * *." Bar Harbor & Union River Power Company v. Foundation Company, (1930) 129 Me. 81, 85, 149 A. 801.

Professor Corbin in his definitive work on Contracts makes the distinction clear in these terms:

"It is true that the language of some agreements has been believed to be so plain and clear that the court needs no assistance in interpreting. Even in these cases, however, it will be found that the court has had the aid of parol evidence of the surrounding circumstances. The meaning to be discovered and applied is that which each party had reason to know would be given to the words by the other party. Antecedent and surrounding factors that throw light upon this question may be proved by any kind of relevant evidence. * * * As long as the court is aware that there may be doubt and ambiguity and uncertainty in the meaning and application of agreed language, it will welcome testimony as to antecedent agreements, communications, and other factors that may help to decide the issue. Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted." Corbin on Contracts, Vol. 3, Page 414, Sec. 579; See also Atlantic Northern Airlines v. Schwimmer, (1953) 12 N.J. 293, 96 A.2d 652, 656.

In the instant case the key words are "alter in any way" as applied to dimensions, boundaries or location of lots, common areas or ways. Webster's Third New International Dictionary defines "alter" as meaning "to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing into something else." In cases assembled in 3 C.J.S. Alter p. 898 "alter" has been assigned these varied meanings: "To add to or diminish; to cause to be different in some respect; to change; to change in some respect, either partially or wholly; to change or modify the form or character of a thing, without changing its identity; to make different without destroying the identity; to make otherwise; to modify; to vary in some degree without making the entire change;

also intransitively, to become different in some respects or to some extent. 'Alter' has been held equivalent to, or interchangeable or synonymous with: 'Amend,' 'change,' 'enlarge,' 'modify,' and 'vary;' and has been distinguished from 'revoke.'"

In Hamilton v. Link-Hellmuth, Inc., (1957) 104 Ohio App. 1, 146 N.E.2d 615, 618 the Court said: "The word, 'alter,' is of wide application, and consequently defies precise and limited definition." The very range of meaning suggests the need for clarifying evidence such as was offered in the instant case to determine what exact meaning was given to the word by the parties. The defendants' argument, when carried to its logical conclusion, would mean that Ganneston could at its sole discretion "alter" by destroying, vacating or sealing off any street or way shown on its recorded plan, thus depriving the plaintiffs and other lot owners of all access to the principal streets and arteries of travel outside of Ganneston Park. Such a result would be so extreme as to be unconscionable. On the other hand the plaintiffs contend that "alter" as used in Article XX should be construed as permitting no more than minor changes in ways as laid out. For the purposes of this case we need do no more than define "alter" negatively—in terms of what it does *not* mean as used in the "Declaration." The evidence viewed in the light most favorable to plaintiffs makes it clear that Ganneston in its use of the word never meant or intended that it should be so construed as to permit the destruction of Cul De Sac as a way, or the transformation of lot #11 from a corner lot into an interior lot, or the loss of the way as a forty foot barrier between lot #11 and the nearest houselot on the northwesterly side, or the loss of the way as access to the northwesterly side of lot #11. Ganneston is estopped by its own representations relied upon by plaintiffs to assign this meaning to the ambiguous phrase, "alter in any way," as used in Article XX. The judgment below can properly rest on this interpretation of the contractual language.

■ But there is a broader view upon which decision here must also rest. Under ordinary circumstances a sale of lots by reference to a plan conveys rights in streets and ways shown thereon to both the grantee and the public. In Harris v. South Portland, (1919) 118 Me. 356, 358, 108 A. 326, 327, 328, the Court described the results which flow from such a grant in these terms:

"His deed referring to the plan of the plotted lots and streets and bounding the lots conveyed by one of those delineated streets, carried with it to the grantee *a right of way in the street* which neither (the grantor) nor his successors in title could afterwards destroy or interfere with and to the public *an incipient dedication of the streets* which neither the grantor nor his successors in title could afterwards revoke. Bartlett v. [City of] Bangor, 67 Me. 460.

"So far as the public is concerned this constitutes, however, only an incomplete dedication or a proposition to dedicate on the part of the owner, and imposes no burden upon the municipality until the street *is duly accepted by competent authority or the public has used it for at least twenty years.* * * *

" * * * a proposition to dedicate land for a public street, which is at best only an inference of law from the mere fact that sales are made according to a plan, *must be accepted within a reasonable time* in order to be effective." (Emphasis ours)

■ The right of way in the proposed streets acquired by a grantee under such circumstances is an "easement by implication based upon estoppel." Arnold v. Boulay, (1951) 147 Me. 116, 120, 83 A.2d 574, 576. Arnold continues, "Such an easement is not based upon a dedication to the public. It is a private right in no way dependent upon a prospective public use." And quoting from Lennig v. Ocean City Association, 41 N.J.Eq. (14 Stew.) 606, 7 A. 491,

"The object of the principle is, not to create public rights, but to secure to persons purchasing lots under such circumstances those benefits, the promise of which, it is reasonable to infer, has induced them to buy portions of a tract laid out on the plan indicated."

■ It is apparent therefore that apart from the effect, if any, of the "Declaration," the plaintiffs upon purchase of their lot by reference to the plan received an easement with respect to the use of Cul De Sac and Deer Run and the public received an incipient dedication of these proposed streets to public use. Ganneston asserts that both right of way and offer of dedication were nullified by its reservation in Article XX. It is well established that although one dedicating land for public use may impose reasonable conditions, restrictions and limitations thereon, he may not impose reservations repugnant to the grant or which contravene public policy. "Such conditions are void, and leave the grant in full and unrestricted operation." 23 Am.Jur.2d 34, Sec. 37; 26 C.J.S. Dedication § 31 p. 457 and cases therein cited. McQuillan on Municipal Corporations, 3d Ed., Vol. 11, Pages 657 and 658 clearly states these principles of limitation.

■■ We are satisfied that where one sells lots by reference to a plan showing streets and ways upon which the purchaser must rely for access to his property and indeed for the very value of the property purchased, an attempted reservation in the granting instrument which would empower the grantor later to nullify all the proposals for streets and ways shown on his plan contravenes public policy. 23 M.R.S.A., Sec. 3012 provides in part:

"When land has been plotted and a plan thereof made, whether recorded or not, showing the proposed location of streets thereon, and lots have been sold by reference to said plan, the municipal officers of the town or city where such land is situated may, on petition of own-

ers of the fee in such of said proposed streets as are named in the petition, vacate in whole or in part the proposed location of any or all such streets as have not been accepted and located as public ways. The proceedings shall be the same as in case of the location of town ways. All damages thereby occasioned shall be paid by the petitioners, and parties aggrieved by the estimate of damages may have them determined in the manner provided respecting damages caused by the location of town ways and with the same right of appeal."

This statute by implication states the public policy which controls here. It clearly rests on the assumption that persons who purchase lots by reference to a plan should not be deprived of the use of streets shown thereon by unilateral action of the owners of the fee in those streets, but only by action of municipal authorities after hearing and upon payment of such damages as may be assessed by such authority. The statute is predicated on the recognition that it is not in the public interest to permit land developers to hold out the hope and expectation of the availability of streets to serve lots being purchased and at the same time to retain the power at their whim to subsequently destroy that availability. There is an element of unfairness involved which renders such action well nigh unconscionable. We hold that with respect to proposed streets shown on such plans, the statutory method of vacating "in whole or in part" is exclusive and an attempt on the part of a grantor to usurp the function by reservation is against public policy. Such reservation as it relates to streets is therefore void.

▉ The Justice below concluded that the potential loss of a street under the circumstances of this case was such a source of injury and damage as to justify equitable relief. The owner asserted his damage in testimony. Moreover, that the vacating of a proposed street which furnishes both protection and access to a lot would cause substantial injury and damage to the lot owner must be deemed self-evident. There was no error in granting the injunction.

Appeal denied.

MARDEN and DUFRESNE, JJ., did not sit.