## Milton B. HILLS

v.

## GARDINER SAVINGS INSTITUTION.

Supreme Judicial Court of Maine.

Oct. 3, 1973.

---

David A. Nichols, Camden, for plaintiff.

Sanborn, Moreshead & Schade, by Richard B. Sanborn, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

This case is on appeal from a Superior Court judgment for the Defendant-Appellee in the amount of $38,542.53, plus certain interest. Although the Plaintiff-Appellant had initially sought a declaratory judgment concerning the parties' rights and obligations, trial actually ensued on the Defendant's counterclaim for judgment on a document signed by the Plaintiff. The Defendant's counterclaim characterizes the document as a contractual guarantee by the Plaintiff to pay the amount of a certain promissory note upon default of the makers. The Plaintiff, however, urges that his signature is merely that of an endorser, thus giving him a status which would require presentment and notice of dishonor prior to his liability on the note. The basic issue on appeal is the determination of the extent of Plaintiff's liability resulting from his signature on the document in question.

The germane facts, if not their interpretation, are clear. A certain couple named Roberts were developers of real estate in Liberty and Montville, both developments being financed by mortgages from the Defendant bank beginning in 1957. Difficulties arose, and in 1963 the bank began to foreclose its mortgages on both properties which secured indebtedness totalling $46,500. Meanwhile, the developers were also in debt about $26,000 to the Plaintiff, a supplier of materials to the Montville development. The Plaintiff had recorded a materialman's lien for $21,364.26 in August of 1963.

In an effort to salvage the situation, the Plaintiff, Defendant and developers met. On January 8, 1964 the developers executed a promissory note in the amount of $30,200 in return for some new financing from the bank. The note obligated the developers to repay their debt in equal monthly installments of $254.86. The Plaintiff agreed to drop his lien and received certain first, second and third mortgages on some property of the developers. The bank placed this indebtedness "on the books" after the Plaintiff signed the separate document,[1] the effect of which is the crux of this controversy.

The document states that the Plaintiff was "endorsing" the above note, a note the document seeks to incorporate into this "endorsement" by reference. His liability is restricted by requiring that any holder of the note first exhaust foreclosure and sale remedies against the principal before asserting a deficiency against the Plaintiff.

[1] The document, signed only by the Plaintiff, reads:

"The undersigned Milton B. Hills who affixes his signature as an endorser to a certain promissory note dated January 8, 1964, in the principal amount of $30,200.00 payable to the order of Gardiner Savings Institution, with interest at the rate of six per cent (6%) per annum, payable in equal monthly payments of Two Hundred Fifty-Four and $86/100 Dollars ($254.86), applied first to interest and then to principal, signed by Vena M. Roberts and/or Ralph Roberts, which promissory note is incorporated herein and made a part of this endorsement, so that said endorsement is and shall be a part thereof, qualifies and restricts his contingent liability as an endorser upon said promissory note in the following manner: (1) The holders shall first exhaust their remedies against the principal maker by foreclosure and sale of any real estate given by the maker to secure the payment of this obligation; the liability of the endorser being limited to any deficiency between the proceeds of such sale and any balance due and payable under the terms of the said promissory note, plus accrued interest and costs incurred by the holders by virtue of such foreclosure and subsequent sale, excepting that the endorser may, upon default of the maker of any of the terms and conditions of said promissory note, at his election, purchase the within note from the holders and demand an assignment of any security or securities given by the maker to the holders to secure the payment thereof."

The Plaintiff also reserved the right to purchase the above note and to demand assignment of any security upon default of the maker. The document contains no acceleration clause and is not dated, though it evidently was signed by the Plaintiff at least by January 24, 1964. Upon signing this document, Plaintiff discharged his lien of record.

The testimony shows that no monthly payments whatsoever have been received by the bank from the developers pursuant to the above note. The bank, as well as the Plaintiff, was forced to foreclose again and apply the resulting money to its indebtedness due from the developers.

Whether the Plaintiff was kept informed of the developers' lack of payment is disputed in the record. The Defendant bank claims that it conferred with, sent letters to and called the Plaintiff to tell him of the situation. The bank also claims that despite these efforts, no response was ever received from the Plaintiff. The Plaintiff asserts that he did not receive notice of the financial problems until months later.

When the bank sought full payment of the amount of the note from him, the Plaintiff commenced his aforementioned declaratory judgment petition, which later was dropped in favor of trial on the Defendant's counterclaim. At the time of trial, 57 monthly installments were due and payable.

First, we must determine whether the document signed by the Plaintiff is an endorsement of the developers' note as claimed by the Plaintiff. As this document was executed in January, 1964, prior to Maine's adoption of the Uniform Commercial Code (U.C.C.), it is agreed that the applicable law governing this issue is the Uniform Negotiable Instruments Act (N.I.L.), formerly Chapter 188 of R.S.1954.

■ The N.I.L. clearly indicates the requirements for creating an effective endorsement of a negotiable instrument such as the note in question. Section 31 of that Act states that "[t]he indorsement must be written *on* the instrument itself or upon a paper *attached* thereto." (Emphasis added.) This is not to say that the endorsement must be signed at the time of the note's execution, but the endorsement must become physically a part of the note by attachment of some type. An instrument's usefulness in negotiation or transfer can only be evidenced by looking at it or any attachments and determining if any endorsements of any kind exist. This N.I.L. requirement of "attachment" had been the law of Maine since the N.I.L.'s adoption in 1917.

■ In the instant case, the record discloses that the Plaintiff signed the document within two weeks of the making of the note and sent the document to the Defendant. The Plaintiff's signature appears only on this document, a separate piece of paper which is not and has not been attached to the note. Although the words "endorse" and "endorsement" appear on the document, that paper cannot serve as an effective endorsement under the N.I.L. unless the dictates of section 31 are met.

■ Additionally, Plaintiff argues that the document he signed incorporates the note by reference and is thus an endorsement "on" the note. Although the doctrine of incorporation by reference is commonly used in wills and contracts, we can find no instance in which it exists in the area of endorsements of negotiable instruments. Although Plaintiff's document attempts expressly to incorporate the note, the Plaintiff cites no authority for this usage of the doctrine and we ourselves can find none. This Court is not persuaded that it should extend the doctrine to endorsements of negotiable instruments. Adoption of the incorporation doctrine could well undermine the precise mandate of N.I.L. section 31 and the smooth functioning of the negotiation process itself. No cogent reasons exist for changing the long-held requirement of attachment of an endorsement to the instrument. In fact, this requirement is con-

tinued by the even stricter language of the N.I.L.'s successor, the U.C.C., in 11 M.R. S.A. § 3–202(2). That section demands that an endorsement be "firmly affixed" to the instrument, as opposed to merely "attached".

■ It is a cardinal rule of construction of contracts that ambiguous language should be construed more strongly against the party who drew up the contract. *E. g.*, Monk v. Morton, 139 Me. 291, 30 A.2d 17 (1943). Plaintiff's attorney's use of "endorser" in an instrument which is not attached to the note contrary to the express provisions of the N.I.L. certainly creates an ambiguity. Therefore, its use should not be construed as an intention of the parties that the Plaintiff should have the benefits that the N.I.L. would have given him if the requirements of the N.I.L. *had* been met.

■ ■ As the endorsement theory can now be dismissed,[2] we feel that the document signed by the Plaintiff is, in effect, a unilateral contract to pay fully any deficiency owed by the developers after foreclosure and sale by the bank. We no longer are exploring the field of negotiable instruments, but are focusing instead on basic contract law as evidenced by the signed document. Of course, our desire is to examine the contract and ascertain the parties' intentions therein expressed. In interpreting contracts, the Court is disposed to look to the substance and meaning of a transaction rather than its mere form. Neely v. Havana Electric Ry., 136 Me. 352, 10 A.2d 358 (1940).

■ Although "endorse" and "endorsement" appear several times in the document prepared by the Plaintiff's attorney, we have already stressed that the writing cannot have the legal effect of an endorse-ment. Not only does the instrument, through its use of the word "endorser", create uncertainty as to the Defendant bank's responsibility in case of the developers' default—it also fails to state explicitly what responsibilities the Plaintiff has undertaken. Although parol evidence of the parties' discussion prior to the writing is not admissible to vary the contract's terms, such extrinsic evidence is allowable to explain ambiguities which cloud the intent and expectations of the parties. Bar Harbor and Union River Power Co. v. The Foundation Co., 129 Me. 81, 149 A. 801 (1930); Ames v. Hilton, 70 Me. 36 (1879).

The record shows that prior to the execution of the $30,200 note and the contract signed by the Plaintiff, the Plaintiff, Defendant and developers met to discuss the developers' financial troubles. This discussion had several results which bear on the interpretation of the Plaintiff's signed contract. First, the bank agreed to stop its foreclosures on the developers' property pursuant to the first two mortgages. It also undertook to release a first mortgage on a garage in the Montville development, to extend the terms of the Montville loan and to advance $5,000 more to the developers. Second, the developers agreed to sign a new $30,200 note to the bank covering the new advance and old debts and to give the Plaintiff certain mortgages. Third, the Plaintiff gave up and discharged his lien while signing the document in question, which placed him in the position of paying any deficiency not obtainable by the bank from the developers. Thus, the developers received new loans, the Plaintiff gained certain mortgages, and the Defendant obtained the Plaintiff's secondary liability on the new note signed by the developers and the freedom of the secured property from Plaintiff's lien.[3] After these transactions, both Plaintiff and Defendant

2. Because Plaintiff's signature is not an endorsement, we do not reach the issue of whether two preconditions to an endorser's liability, presentment and notice of default, took place.

3. The record leaves uncertain which of the parties' original security instruments—that is, the Plaintiff's lien or the bank's original mortgage—was in fact superior to the other.

obviously felt more secure of being repaid ultimately by someone.

There can be no doubt that the Plaintiff expected to be held liable in some capacity after signing the document now described as a unilateral contract. The writing itself says that the Plaintiff "qualifies and restricts his contingent liability as an endorser upon said promissory note . . . ." Later, in explaining his qualified liability, the Plaintiff's document "states that the endorser's liability is "limited to any deficiency between the proceeds of such sale [of the developers' real estate] and any balance due and payable under the terms of the said promissory note, plus accrued interests and costs . . . ." Despite the ambiguities in wording in the contract, there is no doubt that the Plaintiff undertook to pay any remaining deficiency owed by the developers to the Defendant bank. The bank intended such liability of the Plaintiff and demonstrated this by waiting to place the note "on the books" until the Plaintiff's signature had been obtained.

For the above reasons, this Court feels that the Plaintiff has bound himself to pay the Defendant any deficiency remaining after two explicit conditions have been met. First, the Defendant must foreclose and sell any of the maker's real estate which has secured the payment of the obligation and apply the sale's proceeds to the debt in issue. Second, upon default the Plaintiff must be given the opportunity to purchase the note and demand an assignment of any security.

Although the Justice made no express findings of fact, it was necessary to his decision that he be satisfied that these two conditions had been met. The testimony and exhibits were adequate to establish that the Defendant bank foreclosed on the maker's property and informed the Plaintiff of this fact by mail on December 21, 1965. The bank eventually realized $10,000 from the sale of the property and applied this sum to the remaining debt owed by the developers. According to the bank this debt had reached $48,146.73, including the original mortgage, expenses and accrued interest, by 1968. The $10,000 was applied to this sum, leaving a debt of $38,127.73 claimed by the bank. Consequently, the first condition has been met.

The Plaintiff and his attorney were also kept informed by phone as to the default of the developers in making no payments on the new note. Any reply from the Plaintiff was minimal, if any, and he never asked to take over the note per the second condition of the contract. The bank's letter of December 21, 1965 also gave the Plaintiff an opportunity to take over the note and property, but no answer was received. Thus, the second condition has not been breached by the Defendant bank and has been ignored by the Plaintiff. In sum, this Court believes that the contractual liability of the Plaintiff for "any deficiency between the proceeds of such sale and any balance due and payable under the terms of the said promissory note, plus accrued interest and costs incurred by the holders by virtue of such foreclosure and subsequent sale . . ." was established.

A final question remains for resolution. The Defendant's counterclaim seeks payment of the entire debt, alleged to be approximately $38,000. The Plaintiff contends that his obligation, if any, runs only to those monthly payments owing at the time of suit in 1968. The lower court judgment was in the amount of $38,542.53, indicating that the entire obligation assumed by the Plaintiff is now due. We find that the amount of this judgment is in error.

Neither the note nor the Plaintiff's contract contains a clause which accelerates the due date of the total unpaid balance of the note when a monthly payment is not made by the debtor. The debt in question is framed in terms of "equal monthly payments" of $254.86. It is settled law that, in the absence of an acceleration clause, only amounts accrued on a note are due and payable. *See, e. g.,* Lev-

ee v. Mardin, 126 Me. 133, 136 A. 696 (1927); Holcomb v. Webley, 185 Va. 150, 37 S.E.2d 762 (1946); Llewellyn Iron Works v. Littlefield, 74 Wash. 86, 132 P. 867 (1913). A cause of action arises only when the accrued installments on the note are due. Barron v. Boynton, 137 Me. 69, 15 A.2d 191 (1940). As no cause of action exists for an installment payment until such installment is due, we must reject the lower court's finding that the entire debt could be recovered by the Defendant. It follows that a remand to the Superior Court is necessary to assess the proper amount of the judgment to which the Defendant is entitled on its counterclaim.

The entry will be:

Plaintiff's appeal denied in part and sustained in part. Case ordered remanded to the Superior Court for determination of damages in accordance with this opinion.

All Justices concurring.

WEBBER, J., sat at oral argument but retired before adoption of this opinion.