**GENDRON REALTY, INC.**

v.

**N.J. GENDRON LUMBER CO., INC. OF PORTLAND, Maine.**

Supreme Judicial Court of Maine.

Argued Nov. 13, 1986.
Decided Jan. 7, 1987.

Bernstein, Shur, Sawyer & Nelson, Andrew Bernstein (orally), Portland, for plaintiff.

Richardson, Tyler & Troubh, Wendell G. Large, Elizabeth G. Stouder, Edwin A. Heisler (orally), Portland, for defendant.

Before NICHOLS, ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

SCOLNIK, Justice.

The defendant, N.J. Gendron Lumber Co., Inc. of Portland, Maine (the Lumber Company) appeals from a judgment entered after a jury-waived trial in the Superior Court (Cumberland County) in favor of the plaintiff, Gendron Realty, Inc. (Gendron Realty) in the sum of $32,529.03 on a breach of contract claim for a real estate broker's commission. This case presents the novel issue of what constitutes "negotiating" between a real estate broker and a prospective purchaser of industrial property under the terms of an exclusive right to sell real estate agreement. For the reasons set forth herein, we vacate the judgment.

I.

The following facts are undisputed: On March 23, 1982, the Lumber Company and Gendron Realty entered into an "Exclusive Right to Sell" Agreement (Agreement) for a term of 12 months, from March 23, 1982 through March 23, 1983. Under the terms of the Agreement, Gendron Realty was given the exclusive right to sell, for a stated broker's commission, the Lumber Company's industrial property, located at Warren Avenue in Portland, Maine, at a sales price of $359,000. The Agreement, which was prepared on one of Gendron Realty's form contracts, contained an extension clause that read as follows:

> We agree that if a prospect with whom the said Broker [Gendron Realty] or associates *have been negotiating* purchases the said property within six months after the termination of this agreement, the commission shall be due and payable.

(Emphasis added.)

After entering into the Agreement, Gendron Realty worked with another real estate broker, the Boulos Company (Boulos), to find a buyer for the property. Thus, Boulos became an "associate" of Gendron Realty under the terms of the extension clause. Boulos and Gendron Realty agreed to share equally the commission payable under the Agreement.

Sometime in early February 1983, Boulos showed the property and quoted an offering price to the Roberts Office Supply Company (Roberts). Roberts entered into a contract with another seller, however, and did not pursue its interest in the Warren Avenue property until late March, 1983, after failing to consummate the other contract. Only Richard Berry, the owner of Roberts, could make ultimate decisions concerning the purchase of any property.

Before March 23, 1983, Gendron Realty asked the Lumber Company to renew the Agreement, but the Lumber Company refused on the grounds that the property might be taken off the market.

With the permission of the Lumber Company, obtained through Gendron Realty,

Boulos showed the property to Roberts a second time, on March 28, 1983, five days *after* the expiration of the Agreement. Boulos quoted Roberts the same offering price as before. In preparation for the March 28th showing, Boulos furnished Roberts with information on the property.

On April 28, 1983, more than a month after the expiration date of the Agreement, but before the expiration of the 6 month extension clause in the Agreement, the Lumber Company entered into a second "Exclusive Listing Agreement" with another broker, MacBride-Dunham Group (Mac-Bride-Dunham). Four days later, on May 2, 1983, the Lumber Company entered into a purchase-and-sale agreement to sell the Warren Avenue property to Roberts "or its designee" for $275,000. The property was sold to Richard Berry and subsequently occupied by Roberts. The record implies that the Lumber Company paid MacBride-Dunham a commission of $22,500 for the sale.

## II.

■ The central issue on appeal is whether Gendron Realty and Boulos or both had been "negotiating" with Roberts before March 23, 1983 under the terms of the extension clause of the Agreement. We "will hold open to corrective judicial review conclusions resulting from the application of a general legal principle to the facts of a particular case." *Interstate Industrial Uniform Rental Service, Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 917 (Me.1976). The interpretation of a particular term within a written contract is a question of law. *See O'Leary v. Menard*, 118 Me. 25, 27, 105 A. 399, 400 (1919) (interpretation of the meaning of the word "dependent" in written contract and application of that word to undisputed facts is issue of law).

■ The meaning of the term "negotiating" in the Agreement between these parties is ambiguous. *Cf. Barrick Realty Co. v. Bogan*, 422 N.E.2d 1306, 1308 (Ind.Ct. App.1981); *Vint v. Ashland*, 258 Iowa 591,

139 N.W.2d 457, 459 (1966). We resolve any ambiguities in its construction against Gendron Realty, the party who drafted the language and supplied the form contract containing it. *See Hills v. Gardiner Savings Institution*, 309 A.2d 877, 881 (Me. 1973); *Bourgoin v. Fortier*, 310 A.2d 618, 620 (Me.1973).

The Superior Court concluded that Gendron Realty "advanced the sales process to the point where Roberts Office Supply Co. was a realistic or likely prospect" and was therefore entitled to a commission from the Lumber Company because it had been negotiating with Roberts under the terms of the Agreement. This conclusion rested on the court's finding that Gendron Realty, through its associate, Boulos, located Roberts, supplied it with certain information regarding the property, and provided an asking price.

We vacate the Superior Court's judgment because we are unable to accept its definition of the term "negotiating."

■ We hold that in the absence of extrinsic evidence suggesting that the parties to such a contract intended a contrary meaning, the term "negotiating" in the context of the extension clause of a real estate broker's contract means a dialogue aimed at the adjustment or resolution of differences in order to strike a bargain. It involves more than the mere showing of property that is offered for sale or the unilateral provision of information concerning the property. *Cf. Moses v. Gagne*, 140 Vt. 43, 433 A.2d 315 (1981); *see also King v. Dean*, 15 Ohio App.2d 15, 238 N.E.2d 828 (1968), *rev'd on other grounds*, 19 Ohio St.2d 17, 249 N.E.2d 45 (1969).

■ Applying that definition to the facts of this case, and finding no extrinsic evidence that the parties intended to attach a different meaning to the word "negotiating," we conclude that the record does not support a finding that Gendron Realty or its associate, Boulos, had been negotiating with Roberts on or before March 23, 1983, the expiration date of the Agreement. Before that date there was one routine, pre-

liminary showing and certain information was provided by Boulos to Roberts. All that had been communicated by Roberts to Gendron Realty or Boulos was an interest in seeing the property a second time. This evidence is insufficient to support a finding of negotiation. Accordingly, Gendron Realty was not entitled to a commission under the terms of the Agreement.[1]

The entry is:

The Superior Court's judgment in favor of Gendron Realty on its contract claim against the Lumber Company is vacated. The case is remanded with instructions to enter judgment for the Lumber Company.

All concurring.

---

1. Having reached this conclusion, we need not consider collateral issues raised by the Lumber Company, including the correctness of the Superior Court's decision on its counterclaim that was asserted only in the event that it was found liable to Gendron Realty under the Agreement.