MAINE SUPREME JUDICIAL COURT                         Reporter of Decisions
Decision:      2013 ME 95
Docket:        Ken-13-13
Submitted
 On Briefs:    September 26, 2013
Decided:       November 5, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

# BRUCE TISDALE

v.

# THELMA G. BUCH

SILVER, J.

[¶1]   Bruce Tisdale appeals from a judgment of the Superior Court (Kennebec County, *Mills, J.*) in favor of Thelma G. Buch on Tisdale's complaint seeking declaratory and injunctive relief regarding the parties' rights in a certain right-of-way.[1]   Tisdale argues that the Superior Court erred in concluding that Buch owns the right-of-way pursuant to the Paper Streets Act, 23 M.R.S. §§ 3027, 3031-3035 (2012); 33 M.R.S. §§ 460, 469-A (2012),[2] and in finding that the right-of-way is not part of a common scheme of development.   We affirm the judgment.

---

[1]   The complaint names thirteen plaintiffs, but only Tisdale participated in this appeal.  As such, we address only Tisdale's rights and do not address the potential rights of other parties.  On June 28, 2012, a suggestion of death was filed in the trial court pursuant to M.R. Civ. P. 25(a) indicating that defendant Frederick Buch had died during the pendency of the litigation.

[2]   Title 33 M.R.S. § 469-A was amended during the pendency of this case, before trial, but the amendments are not relevant to this appeal.  P.L. 2011, ch. 312, §§ 1-3 (effective Sept. 28, 2011) (codified at 33 M.R.S. § 469-A(1)-(2), (6)-(6-A) (2012)).

## I.  BACKGROUND

[¶2]    In 1953, Vernold and Beatrice Gregory purchased land on Annabessacook Lake in Monmouth.  Thelma Buch and her late husband, Frederick Buch, began staying in cabins on the property in 1962.  In 1970, Vernold Gregory asked Mr. and Mrs. Buch if they wanted to buy one of the cabins.  Mr. and Mrs. Buch purchased Lot D as depicted on a 1969 subdivision plan, which was recorded in the Kennebec County Registry of Deeds.

[¶3]  The 1969 plan shows a twenty-foot right-of-way between Lots B and C running to the lake.  The right-of-way was to be used by guests in the main lodge, which had no beach access.  Frederick Buch objected to the right-of-way in 1969, and Vernold Gregory told him that he "would take care of it."  Mr. and Mrs. Buch understood this to mean that Vernold Gregory would ensure that the right-of-way would not be used.  Nothing in the 1969 plan suggested that there would be a second phase of development pursuant to a second subdivision plan.

[¶4]   After selling the original lots shown on the 1969 plan, the Gregorys created more lots, behind the original lots, as shown on a 1970 subdivision plan, also recorded in the registry of deeds.  The 1970 plan does not show the original lots or the right-of-way between Lots B and C.  In 1972, Nelson McIntire bought part of the Gregorys' land, including the lodge, and developed some of the back

lots. He and his family used the right-of-way to access the lake until the mid-to-late 1980s, when he retired and sold the lodge.

[¶5] Bruce Tisdale bought one lot in 1971 and another in 1975. The lots Tisdale purchased are not shown on the 1969 plan and the deeds transferring these lots do not mention the right-of-way. One of Tisdale's lots is shown on the 1970 plan, and the deed to that lot mentions the 1970 plan. Of the numerous deeds later admitted in evidence at trial, only the deed to Scott and Tammy Coutu references the right-of-way, and that language was not present in earlier deeds in their chain of title.

[¶6] In 1980 and 1991, Mr. and Mrs. Buch purchased Lots B and C, as depicted in the 1969 plan, from the Gregorys' original 1970 grantees. The deeds transferring Lots B and C refer to the 1969 plan, but do not mention the right-of-way. Tisdale and others in the area continued to use the right-of-way to access the lake for recreational purposes. In 2005 or 2006, Mr. and Mrs. Buch grew concerned about the behavior of people using the right-of-way and feared that they could be held liable for injuries to those using the right-of-way. After consulting with an attorney, they posted a notice on the right-of-way stating that only they, as owners of the adjacent lots, could use the right-of-way.

4

[¶7] On September 17, 2010, Tisdale and twelve other plaintiffs[3] filed a complaint against Mr. and Mrs. Buch in the Superior Court seeking (1) a declaratory judgment, (2) a permanent injunction, (3) to quiet title, and (4) to establish statutory and common law prescriptive rights. A jury-waived trial was held on July 11 and 12, 2012. Tisdale offered the expert testimony of Elliot Thayer, a professional land surveyor and engineer, who prepared a composite of the 1969 and 1970 plans, as well as an earlier 1960 plan, by overlaying the three plans on top of one another and adding information gathered from tax maps and town records. Although the three plans did not align precisely, Thayer opined that the 1970 plan showed an extension of the right-of-way depicted in the 1969 plan. Thayer concluded that because the plans shared a common developer and common roads or rights-of-way, a common scheme of development existed. He did not perform a survey.

[¶8] On December 18, 2012, the court entered a judgment concluding that Thelma Buch owns the right-of-way by virtue of her ownership of the adjoining Lots B and C, pursuant to the Paper Streets Act. The court further concluded that

---

[3] The other plaintiffs were Jay Reynolds, Thomas and Kathleen Nation, Blaine and Rena Gordon, Robert and Carmen Caron, Scott and Tammy Coutu, Laura Frost, and Michael and Deborah Stufflebeam. The claims of the Nations, the Stufflebeams, and Laura Frost were dismissed before trial, and the Gordons apparently did not participate in the trial. The court's order dismissing Frost's claims was never entered on the docket, but it appears in the record.

even if we were to recognize the common scheme of development doctrine, no such scheme existed here.[4] Tisdale timely appealed.

## II. DISCUSSION

### A. The Paper Streets Act

[¶9]  The purpose of the Paper Streets Act, 23 M.R.S. §§ 3027, 3031-3035; 33 M.R.S. §§ 460, 469-A, enacted in 1987, was to "clarify title to old, proposed, unaccepted streets shown on subdivision plans, and to eliminate the possibility of ancient claims." *Brooks v. Carson*, 2012 ME 97, ¶ 24, 48 A.3d 224 (quotation marks and citations omitted).  In particular, 33 M.R.S. § 469-A "was created to resolve ownership disputes regarding roads and streets laid out on subdivision plans where the original owner did not reserve title in the roads and where the roads have never been accepted by a town." *Lamson v. Cote*, 2001 ME 109, ¶ 14, 775 A.2d 1134.  Section 469-A provides, in part:

> **1. Reservation of title.**  Any conveyance made before September 29, 1987 that conveyed land abutting upon a proposed, unaccepted way laid out on a subdivision plan recorded in the registry of deeds is deemed to have conveyed all of the grantor's interest in the portion of the way that abuts the land conveyed, unless the grantor expressly reserved the grantor's title to the way by a specific reference to this reservation in the conveyance of the land.

> **2. Intent to reserve.**  Any grantor who, before September 29, 1987, conveyed land abutting a proposed, unaccepted

---

[4]  The court also concluded that there was no prescriptive easement over the right-of-way.  That conclusion is not challenged on appeal.

way laid out on a subdivision plan recorded in the registry of deeds with the intent to reserve title to the way, but who did not expressly reserve title to the way as required in subsection 1, or any person who claims title to the way by, through or under the grantor, may preserve the grantor's claim by recording the notice set forth in subsection 3, in the registry of deeds where the pertinent subdivision plan is recorded, within 2 years after September 29, 1987.

33 M.R.S. § 469-A(1)-(2). If the grantor or his successors fail to reserve title as set forth in the statute, the abutting landowner is deemed to own to the center line of the portion of the way abutting his or her property. *Id.* § 469-A(6).

[¶10] Although the statute does not define "proposed, unaccepted way[s]," we have defined the term, for purposes of other provisions, as meaning "roads, constructed or unconstructed, that are depicted on a subdivision plan recorded in the registry of deeds and that are proposed to a municipality for acceptance but not yet accepted by the municipality." *Fournier v. Elliott*, 2009 ME 25, ¶¶ 14, 20, 966 A.2d 410. Tisdale concedes on appeal that the right-of-way is a "proposed, unaccepted way" within the meaning of the statute. There was no reservation of title to the right-of-way in Mr. and Mrs. Buch's chain of title tracing back to the Gregorys. Therefore, Thelma Buch owns to the center line of the right-of-way abutting each of her lots. *See* 33 M.R.S. § 469-A(6). Because the right-of-way runs between her two lots, she owns the entire way. *See id.*

[¶11] Tisdale argues that 33 M.R.S. § 469-A does not apply because the right-of-way is not a "paper street" as we defined that term in *Driscoll v. Mains*,

2005 ME 52, ¶ 1 n.2, 870 A.2d 124. Section 469-A does not apply to "paper streets," however—it applies to "proposed, unaccepted way[s]." 33 M.R.S. § 469-A. We have defined the term "proposed, unaccepted way," and have made clear that it is not equivalent to a "paper street." *See Fournier*, 2009 ME 25, ¶¶ 16, 20, 966 A.2d 410.

[¶12] Tisdale further argues that he acquired private rights in the right-of-way that have not terminated pursuant to 23 M.R.S. § 3031(2). Tisdale has no such rights, however, because his lots are not shown on the 1969 plan that depicts the right-of-way, and his deeds do not reference the 1969 plan. *See id.* ("A person acquiring title to land *shown on a subdivision plan* . . . acquires a private right-of-way over the ways laid out in the plan." (emphasis added)); *see also Callahan v. Ganneston Park Dev. Corp.*, 245 A.2d 274, 278 (Me. 1968) (stating that the sale of lots "by reference to a plan" creates a right-of-way in proposed streets shown on the plan). The Court did not err in its application of the Paper Streets Act.

B.    Common Scheme of Development

[¶13] We have acknowledged, but never expressly adopted, the common scheme of development doctrine, also known as the doctrine of implied equitable servitudes or implied restrictive covenants. *See Thompson v. Pendleton*, 1997 ME 127, ¶ 11 n.2, 697 A.2d 56; *3 W Partners v. Bridges*, 651 A.2d 387, 389

8

(Me. 1994); *Olson v. Albert*, 523 A.2d 585, 588 (Me. 1987) (per curiam); *Chase v. Burrell*, 474 A.2d 180, 181-82 (Me. 1984). The doctrine applies when

> (1) a common owner subdivides property into a number of lots for sale; (2) the common owner has a "general scheme of development" for the property as a whole, in which the use of the property will be restricted; (3) the vast majority of subdivided lots contain restrictive covenants which reflect the general scheme; (4) the property against which application of an implied covenant is sought is part of the general scheme of development; and (5) the purchaser of the lot in question has notice, actual or constructive, of the restriction.

*Thompson*, 1997 ME 127, ¶ 11 n.2, 697 A.2d 56 (quoting *Chase*, 474 A.2d at 181). "The common grantor may establish a general scheme by conveying the majority of his subdivided lots subject to a restriction that reflects the general scheme." *3 W Partners*, 651 A.2d at 389. Whether a lot is part of a common scheme of development is a factual finding that we review for clear error. *See Chase*, 474 A.2d at 181-82. A finding is clearly erroneous only when it lacks any competent support in the record. *Id.*

[¶14] Here, even if we were to recognize the common scheme of development doctrine, the record amply supports the trial court's conclusion that no such scheme existed in this case as to the right-of-way. Only the Coutus' deed referenced the right-of-way, and, as the Superior Court found, that language was not present in earlier deeds in their chain of title. *See 3 W Partners*, 651 A.2d at 388-89 (affirming the trial court's determination that no general scheme existed

where the deeds to only three of sixty-seven lots contained restrictive covenants that reflected the general scheme); *Olson*, 523 A.2d at 588 (concluding that no general scheme existed where the deeds to only four of sixteen lots contained the relevant restriction). Nothing in the 1969 plan suggests any further development, and Vernold Gregory told Frederick Buch that he would "take care" of the right-of-way issue when Buch objected to it. Although Tisdale's expert opined that there was a common scheme of development, he admitted that his composite plan contained discrepancies and that no survey was performed to resolve those discrepancies. *See Powell v. Powell*, 645 A.2d 622, 624 (Me. 1994) ("It is within the fact finder's discretion to accept or reject the opinions of expert witnesses.") The court did not err in finding that there was no common scheme of development. We find no merit in Tisdale's remaining arguments and therefore do not address them further.

The entry is:

> Judgment affirmed.

_____

**On the briefs:**

Frank K. N. Chowdry, Esq., Atkins Chowdry, LLC, Portland, for appellant Bruce Tisdale

Thomas G. Mundhenk, Esq., Mundhenk & Bell, LLC, Portland, for appellee Thelma Buch

Kennebec County Superior Court docket number RE-2010-146
FOR CLERK REFERENCE ONLY